GEORGE E. BROWN V. JOHN B. DRAKE.

[FILED FEBRUARY 18, 1890.]

The Evidence examined, and *held*, to sustain the verdict to the extent of $295.25; but that as to $204.75 of the sum found by the verdict, it is not sustained, and the latter sum required to be remitted or the judgment will be reversed.

ERROR to the district court for Adams county. Tried below before GASLIN, J.

*Capps, McCreary & Stevens*, for plaintiff in error.

*Tibbets, Morey & Ferris, contra.*

COBB, CH. J.

The plaintiff below alleged that on April 7, 1888, he contracted with the defendant for an exchange of certain real and personal property, and the payment to defendant of $2,000 according to the following stipulation :

"EXHIBIT A.

"For lots in Omaha city described as follows: Lot 5, block 5, Kendall's addition; lots 1, 2, 3, 4, B. 8; 12, 18, Bk. 9 ; 12 and 18, in Bk. 27; 8, 9, 10, 11, and 12, B. 34; L. 1, 11, 12, 13, and 14, B. 40; L. 1, 2, 23, and 24, B. 41;

in all, 20 lots, in Boggs' addition to Omaha, and $2,000 cash, I agree to transfer to J. B. Drake, all cattle in my herd, not less than 125 head, not including late calves, and including 4 bulls, one span young black mares in foal, one span geldings, 4 years old; one span mules, 6 or 7 years old; one bay horse, 6 years old; four colts, 1 to 2 years old; all good American stock, no pony; 3 wagons; 3 hay sacks; 3 sets of harness; 1 stallion, Winona, bay; also equity in N. E. quarter, section 22, township 7, range 16, Kearney county, incumbrance $1,000.

"GEORGE E. BROWN."

That in accordance with said agreement the plaintiff paid the defendant the said sum of $2,000, and the defendant delivered to plaintiff what purported to be a bill of sale of the personal property mentioned, referred to as Exhibit B.

It was further verbally stipulated that the cattle mentioned might be left with the defendant until called for, by the 24th of April, 1888, and that defendant execute a warranty deed for the premises described in Kearney county free of all incumbrances except that of $1,000, with an abstract of title to the premises.

That plaintiff fully complied with all the conditions of the contract on his part, and on April 21, 1888, demanded the cattle of the agent of defendant, in whose care and possession they were, but who refused to deliver the same.

That at the time of entering into the contract the defendant falsely represented, for the purpose of defrauding the plaintiff, that the cattle were free of all liens, mortgages, and incumbrances, when, in fact, there were chattel mortgage liens, in all amounting to $1,400, then unknown to plaintiff, which were not entirely discharged until May 14, 1888; and through the failure to deliver the cattle and discharge the liens thereon, and the consequent loss of time and the additional expense involved, plaintiff suffered damages to the amount of $400.

That the whole number of cattle in the herd at the time of the contract, and on April 21, following, was 131 head, but defendant delivered on May 14, following, only 118 head, and refused to deliver or to pay for the remaining 13 head of cattle, amounting to $390; that of the cattle delivered 50 head were not the same mentioned in the contract and bill of sale, but were a different kind and inferior quality, and were worth $500 less than those purchased of defendant, and were not accepted by plaintiff in lieu of those purchased.

That there is now due on the land conveyed by defendant to plaintiff the tax sale, with accrued interest, of 1886, taxes and interest of 1887, and accrued interest on the mortgage of $1,000, amounting to $250.15, valid and existing liens, which the defendant has neglected and refused to pay; that defendant failed to deliver an abstract of title to the land, which the plaintiff obtained at his own expense, amounting to $4.

Plaintiff asks judgment for the sum of $1,544.15.

The defendant answered in a general denial of the plaintiff's cause of action.

2. The defendant further set up that, after the alleged cause of action accrued, and before the action was brought, on May 14, 1888, at Hastings, Nebraska, all matters of difference in damages alleged in plaintiff's petition, the feeding of stock, death of stock, herding of cattle in question, cost of deed, abstract, back entries, and taxes, and all other matters in difference, were settled and fully adjusted between the parties, and the plaintiff at the time drew and delivered to defendant his check on the Omaha National Bank for the sum of $25 in payment of the balance then found due from him, in full satisfaction and discharge of the damages in the petition claimed and demanded of defendant.

The plaintiff replied in a general denial of the defendant's answer.

There was a second trial to a jury, a new trial having been granted on the motion of the defendant, with findings for the plaintiff and verdict for $500 damages.

The defendant's motion to set aside the verdict being overruled, judgment was entered for that amount and costs.

The plaintiff in error presents thirteen separate assignments to the sufficiency of the evidence and the instructions of the court to the jury.

It appears that, on the trial, the plaintiff below testified, as a witness in his own behalf, that on April 3, 1888, he bargained with the defendant for a lot of cattle, and drew up the agreement set forth, which was signed by defendant.

By this stipulation, in consideration of the lots therein mentioned, and of $2000 cash, the defendant agreed to transfer to plaintiff the cattle and stock, and the personal and real property mentioned, in pursuance of which defendant executed a bill of sale on April 7, 1888, for the following property: "125 head of cattle; 1 span of black mares, 6 years old; 1 span of bay geldings, 4 years old; 4 yearling colts; 1 bay stallion, *Winona*; 3 wagons with hay racks; 3 sets of double harness; the same being on the farm at Newark, and the Island, and at defendant's barn in Hastings, as seen by the plaintiff the same day."

That after the delivery of the contract and bill of sale witness had a conversation with defendant, in which it was agreed that the cattle were to be delivered on April 20, 1888; that on that day witness came up from his residence, in Omaha, to defendant's residence, in Hastings, to receive the cattle, and there was some conversation then had as to the deeds witness was to make, under the stipulation, "or rather that two lots had, by mistake, been left off his deed; he told defendant he would send and have the deeds sent up the next morning, but he would not wait, and witness took the next train to Omaha, and came back with the deeds and delivered them to defendant's wife, who gave

witness an order, on the man in charge of the cattle, to turn them over to witness, but the man refused, saying that Mr. Graham told him not to, as he had a chattel mortgage on them for $1,080.    Witness returned to Hastings, and saw defendant's wife, and in a few days afterwards the mortgage matter was arranged by her, and about the first of May witness made a second demand for the cattle, which the foreman refused, on his claim for a feed bill of $100, which witness said he would pay under protest."

The plaintiff does not testify that he paid the $100, but that the agent refused, for the reason that Mr. Radford owned part of them.    He further testified, that defendant was, for a portion of the time, between April 23 and May 12, absent in Chicago.    In reply to inquiry from his counsel he stated "that he returned with the deed for the two lots that were lacking, he thought on April 25; that he demanded the cattle on May 1, and that he obtained them on May 14; that from April 25 to May 14 he was between Newark, where the cattle were in herd, and Hastings, a part of the time at either place, using every endeavor to get things straightened up, so he could get possession of the cattle."

Q. What claim, if any, did Brown make on you from the 25th of April to the 14th of May?

A. He made a claim for the feed and keeping of the cattle.

Q. What conversation did you have with him on April 20, when you first came here for the cattle?

A. Not very much.    Witness first met him at his house; the next time at the depot, as he was taking the train for Chicago, and he refused to deliver the cattle until the deeds were delivered; witness offered to secure him through the bank here, for the lots, and have the deeds for him the next morning, but he would not do that, nor give an order to take the cattle when witness should get the deeds.

Q. What kind of cattle did you view, when down there on the 7th of April, with Brown?

A. I viewed 122 or 123 of the 125 head.    They were good cattle, mostly large, not over twenty or twenty-five young cattle—yearlings; the rest were cows and two-year-old steers.

The plaintiff also testified that he knew the value of cattle in the markets of that season; that he was buying and selling cattle, and the average value was about $27 per head; that when he received the cattle there were 117 head, an inferior lot of cows, the steers were as first inspected, and the balance a very inferior lot of yearling steers and heifers.    Of the original herd inspected, he thought there were thirty-five or forty head of cows taken out, and an inferior lot of yearlings substituted; that the thirty-five cows taken out were worth $30 per head, and those thus substituted not to exceed $12 per head; that plaintiff's expense from the 25th of April to the 14th of May, when he received the cattle, was that of the board of two men and his own, back and forth from Hastings to Newark, and telegraphing, and two trips to Minden to get the mortgages fixed up, which required three and three-fourths days; boarding at Hastings for three men at $2 per day, $33; his own boarding with that of the three men, up to May 14, was $75.    There were other expenses: getting deeds recorded, and two trips to Minden, and for the plaintiff's time expended, eighteen days, at $10 per day, $180.

The plaintiff introduced the deed from the defendant and his wife, for the quarter section of land stipulated to be conveyed to the plaintiff, containing the usual contract of warranty, except as to two certain mortgages of $700 and $300, amounting to $1,000, and the taxes of 1888, claiming, in his testimony, that of the interest paid up to the 1st of June, on the $700 lien, $31.50 was due from defendant, and on the $300, $20.25 was also due, as the accrued interest, prior to the transfer of the property.

The testimony of plaintiff relating to the settlement with defendant is given in full, as follows:

Q. State when you had your last conversation with the defendant and what it consisted of.

A. It was May 13th, when witness came down from Newark, after defendant had settled with Radford, and witness wanted to make arrangement to get away the next day. Defendant had charges against witness for keeping the cattle from April 7th to May 13th. Witness was not to have paid these charges, but he refused to deliver the cattle, and gave instructions to his men not to deliver them until the charges were paid. After being delayed so long, witness was willing to do most anything so he could get away. Defendant demanded pay, and after talking sometime he told witness, "you pay me $25 and you can take the cattle." Witness said that he had got to pay it, he supposed, as he must get away, but he said that he "did not consider it due, and that it was no settlement, and there would be a settlement hereafter." So witness gave him a check for $25, left his house, and got the cattle,— got 117 head of them, not then knowing about the changes in the herd until he got possession of them.

Robert Radford, a witness for the plaintiff, testified that he resided at Newark, was acquainted with the parties, was present at the time they came there to inspect the cattle purchased by plaintiff of defendant, about April 7, 1888; knew the cattle there, about 133 or 134 head; they were not all defendant's cattle, part belonged to witness. Samuel Tweed was the agent in charge of defendant's cattle there.

Q. What conversation had you with Tweed, if any, or what did he do, if you know, in regard to the changing of these cattle?

A. There were about thirteen of the best cows taken out, and other stock put in their place.

Q. What was the value of those cows at that time, and what of the yearlings substituted?

A. The cows $30 per head, and the yearlings about $13 per head.

This witness further testified that 117 head were turned over to plaintiff; that five head had perished in a storm, the 1st of May, of those originally inspected, and that after plaintiff had taken the stock away, there were fifteen left on the farm, and two cows, let out for milk.

Fred Radford, a witness for plaintiff, testified that he resided at Newark; was acquainted with the parties to this suit; was first acquainted with the plaintiff April 7, 1888, when he came down to inspect the cattle, which witness was herding and feeding, and which plaintiff took away May 1.

Q. What cattle, if any, had been substituted?

A. There were thirteen of the best cows taken out, and yearling cattle put in their place, between the 15th and 20th of April.

Q. Who were you working for?

A. Under Tweed, who was foreman for Brown. He instructed me to make the change. The cows taken out were worth $30 per head, and the yearlings substituted from $12 to $13 per head—they were poor. Two cows, two steers, and a heifer died and were lost in the storm of May 1.

The defendant was sworn as a witness and testified, in reference to the alleged settlement between the parties, that the last deed made by plaintiff, for the two lots omitted in prior deed, was delivered on April 27; that the next time witness saw plaintiff was at witness's house, in Hastings, on May 12, when we had conversation on matters pertaining to the stock. He left on a freight train for Newark, on that day, to see Radford, and came back in the evening and made arrangements to meet at witness's house on May 14th, and he came on that day.

Q. Who was there?

A. My wife, Miss Teeter, the plaintiff, and myself. There was a short talk about the stock, about the feed bill,

and of the stock that had perished; when he got through he came in to settle; he stated that in my absence he had been to some inconvenience in not getting his stock, and asked who witness thought should stand the loss of the seven head that had perished; the witness thought the plaintiff should as they were his cattle, and then they turned to the feed bill for 125 head of cattle, 7 head of horses, and 4 colts; he suggested that as he had been put to trouble and expense witness ought to make some allowance on the feed bill, and mentioned some items, such as recording two deeds, $2; abstracts on same, $2; interest unpaid to date of deed, $27; taxes, $14.50 and $16.54; those he thought witness ought to pay—a total of $52.15. He stated that if he paid Radford's bill of $23.60, for taking care of the cattle, witness ought to call it square with him; to which witness replied he did not think it fair that he should stand such a bill, but "that if plaintiff would give him $25 he would call it all square, and jump the whole matter and a settlement," and the plaintiff said "he would do it," and sat down and wrote a check, and witness gave him a receipt for the whole business.

Q. What was said about plaintiff's expenses subsequent to April 20, including the pay and board of his men; or what did he come to your house for, if you know, on May 14?

A. He said he came to settle our matters on the feed bill, as he wanted to close it up and get away.

Q. Were all matters of difference between you considered?

A. Yes, sir, all matters were talked over, taxes, interest, cattle that had died, feed bill, and everything.

Q. Previous to that time had you loaned him money, and if so, how much?

A. Yes, sir; $25, about the 8th of April, which was included in the settlement.

Q. Have you had any transactions with him since?

A. None.

This testimony of defendant is, in the main, corroborated by that of his wife and of Florence Teeter.

The evidence on the part of the plaintiff below, under the seventh cause of action, as set out in the petition, to say the most to be claimed for it, was scarcely sufficient to sustain a verdict thereon, had there been no alleged settlement between the parties of their business transactions; and the whole of the evidence applicable, as well on the part of the plaintiff as on that of the defendant, tends to prove that there was such a settlement on May 14, 1888, and that it embraced the several claims of the plaintiff set up in the seventh cause of action. But such settlement clearly did not embrace the claim for shortage in the delivery of the cattle bargained for, and the substitution of inferior stock for those of greater value as set out in the eighth and ninth causes of action, and in the testimony of the plaintiff and the two witnesses Radford. For the plaintiff testified that at the time of the alleged settlement, before the cattle were turned over to him, he was not aware of the deficiency. There is some confusion in the evidence as to the precise number of cattle to which the plaintiff was entitled. The stipulation called for all the cattle in defendant's herd, not less than 125, not including late calves.

In the examination of witnesses by plaintiff's counsel there is no attempt to prove, and certainly no proof, that there were in the herd, at the time of the sale, more than 125 head.

There was proof that Radford claimed to own ten head of the cattle; and also that there were seventeen head, fifteen yearlings and two cows, on Feather's place, belonging to defendant. It is possibly the theory of the plaintiff that, as the defendant sold him the herd, not less than 125, and as there were ten or more on the place additional, and the defendant had an equal number not in the herd, but on another farm, the plaintiff was entitled to those, equal to the number of Radford's which were in the herd at the

time of the sale and inspection by the parties.   This theory, to my mind, is not admissible.   There is no pretense that the plaintiff counted the cattle at the inspection, and it does appear in writing, and throughout the transaction, that the number was limited to 125.   As claimed by the plaintiff below, in his petition, one hundred and eighteen were delivered and received, leaving a deficiency of seven. There is proof that five head were lost by storm on the 1st of May, between the sale and the delivery.   According to the evidence of the  defendant, and of two witnesses, that loss was one of the accounts embraced in the settlement of May 14; and the plaintiff testifying as to the same transaction, makes no mention of the loss, though examined in rebuttal, after the defendant's testimony was closed, and is questioned by a juror as to his receipt of the cattle in a condition different from that at the time he bought them, and says nothing of the loss of cattle by death, or that defendant disclaimed any such loss.

There is evidence that a number of the cattle were wrongfully exchanged for others of less value, which were subsequently delivered to the plaintiff.   The difference of value of those taken out of the herd, and of those substituted, the plaintiff is entitled to recover.   There is a wide difference, however, between the plaintiff's estimates of the number thus taken and substituted, and of the consequent loss sustained, and that of the apparent weight of evidence in the case on those points.   He does not, however, claim to have any exact knowledge of the number or the value of those taken and exchanged.

The witness R. Radford, who was in possession of the premises where the cattle were herded and  fed, states that the number taken out was thirteen cows, valued at $30 each, $390, and there were substituted thirteen yearlings valued at $13 each, $169; on account of which the plaintiff's loss would be $221.

The witness F. Radford, who was the herder under

45

Tweed, the defendant's foreman, testified that he made the exchange under the orders of the foreman, corroborating this estimate of the number and value of the cattle taken out and substituted. It would seem to satisfactorily establish the estimate as stated.

On either theory, that the loss of the five cattle of the herd by storm was the plaintiff's loss, or that his claim for them was embraced in the settlement of May 14, there would still appear to be two head of cattle to be accounted for by the defendant. The plaintiff's evidence fixing the average value of the cattle at $27 each, in the absence of other evidence as to the fact, will be accepted as correct, thereby finding the additional sum of $54 due the plaintiff, and a total of $275 on account of the cattle due from the defendant.

The verdict in the court below to this extent we find sustained; to a larger amount it does not appear to be supported by the evidence. There was evidence of a mortgage lien on the land conveyed to the plaintiff greater than the amount excepted in the covenant of warranty, but it is not claimed that such excessive lien had been discharged, nor will it be claimed that an action lies therefor until it has been discharged.

In addition to the finding of $275 the plaintiff would be entitled to interest thereon from May 14, 1888, to the date of judgment, June 4, 1889, amounting to $20.25.

It is therefore considered that the judgment of the district court will be reversed, and the cause remanded for further proceedings, unless the defendant in error shall, within thirty days from the filing of this opinion, enter a remittitur in the office of the clerk of this court of the sum of $204.75 as of the date of the judgment in the court below; and in that case the judgment is otherwise affirmed.

JUDGMENT ACCORDINGLY.

THE other judges concur.